And we will next hear from counsel in the United States v. America v. Philip Gross. And Mr. Ossovitch, you have reserved two minutes. Is that correct? That is correct, Your Honor. May it please the court. My name is Jay Ossovitch and I represent Appellant Philip Close. Mr. Close, a music teacher who operated a small music school, pleaded guilty to 61 counts of producing child pornography and 13 counts of possessing child pornography. This is not your typical child pornography production case. Mr. Close hid a motion activated camera in the music school's restroom to record images of people relieving themselves.  He did not film other persons sexually abusing children. He did not direct them to engage in sexual acts for him to film. He did not direct the children to take sexually explicit photos of themselves or others. He did not coerce them into sending him images. The district court determined that he had a guideline sentencing range of 25,080 months. That is 2,090 years. The district court decided that a variance was appropriate and imposed an aggregate sentence of 600 months. That's 50 years in prison. Would you clarify something for me? The statement that you made is accurate with respect to the cameras that were installed in the toilets, but it seems to me not to be accurate with respect to the videos that you made through the cameras that were on the ceiling, which did observe him, if I am correct. It did observe him touching, doing unwarranted, inappropriate touching of the children on their thighs, in the general genital area, in the area of their breasts. So it seems to me the statement that you made was not exactly accurate in describing the basis of the sentence. Your Honor, according to the government, the images that were taken inside the classroom itself from those hidden cameras, well, actually those cameras weren't hidden, they were actually visible. The government described that as grooming behavior. As what? As grooming behavior. Grooming. Yes, ma'am. Yes, Your Honor. They never described it as sexual conduct. They never described it as sexual abuse. If those images are creepy, they're clearly inappropriate. But they were never described by the government as sexual contact. But the judge understood what they depicted, and as do we. And so to the extent that you suggested in your argument that all he did was photograph children relieving themselves, that's not accurate, as Judge LaValle pointed out. Now, how we're going to label it is another matter, but it's not just photographing children relieving themselves. No, but he was also never charged for those images. Those images were shown. There's a legal significance, and then there is a help us understand this by being more accurate than what you are being right now. So all three of us have suggested that perhaps you be careful with how you're wording this, because we are aware of the facts is what I think we're generally trying to tell you. Okay. Thank you, Your Honor. I'm sorry. No, go ahead, please. Okay. Thank you. The district court imposed an aggregate sentence of 600 months imprisonment. That's 50 years. 360 months for the production counts and 240 months on possession counts to be served consecutively to the 360-month sentence. For him, this is a life sentence. If he doesn't die in prison, the BOP expects him to be released on July 13, 2062, just shy of his 85th birthday. I've raised two points on appeal. The first challenge is the reasonableness of the 50-year aggregate sentence. My arguments are focusing on that this morning. The second point raises the question as to whether the images he produced and some of the images he possessed are, in fact, child pornography. This point has previously been addressed by this court in United States v. Spoor. I've raised this issue simply to – Is this a challenge to his guilty plea? This is a possible challenge to his guilty plea. What do you mean possible challenge? The argument is made to us to secure what relief? On that point, we're just acknowledging that we're foreclosed by Spoor and that we are preserving this for possible further appellate review based on cases that are going through the circuit. Other circuits. And at the time the brief was filed, this was based on United States v. Hilly in the D.C. circuit, and there are other cases that are currently working their way in the circuit. So we're just simply preserving this point. But we acknowledge that within the Second Circuit, Spoor controls, and we're not directly challenging that at this moment. But I understand that you're teeing this up for a circuit split in which the Supreme Court might actually decide something different than what is law in here. Is there no way where we can thread the needle such that both Spoor and Hilly can peaceably coexist and have your client get the relief that he seeks? Or, period, doctrinally, are they in the future, obviously? Is there a way that we can harmonize this? I see this in the future unless the panel decides to bring this en banc. At the moment, we are not asking for that. I'm asking, is there a way to harmonize this moving forward? Not that I can envision at this moment, Your Honor. Okay, so someone has to say it's either Hilly or it's Spoor. Correct, Your Honor. Okay. And you understand that we can't do that. Can you answer for me, you're conceding that the sentencing is below guidelines. Correct, Your Honor. Can you explain why you don't think that this is an issue that should be left open to Congress and the Sentencing Commission? Because even a sentence below the guidelines may still be unreasonable. The idea within sentencing under Section 3553A is that a sentence must be sufficient but not greater than necessary. And in this case, a de facto life sentence, it is a life sentence, is greater than necessary. The guideline sentence was controlled by the way he was charged in the indictment because he rejected a plea offer by the government. So the government decided to come back and charge him in a 74-count indictment. And that became the controlling factor at sentencing with the court addressing that he had never seen 74 counts in this type of a case. Right, but you read that as that was outrageous on the part of the government. It could be read as this is a real serious predator and I need to account for it time-wise, right? I mean, I wasn't in the courtroom. But that fact can be cut both ways, at least to the record that we've got in front of us. Isn't that right? Well, in terms of the serious predator, if you look at the other types of cases where production has been charged, the acts committed by him, the bathroom camera, does not rise to the same level. For example, in United States v. ONI. Right, but it's just not the conduct, right? It's the position of trust. It's the number of people involved. It is the forethought that went into trying to get away with it, right? These are all things that are appropriate for the sentencing judge to consider. Would you agree? That is correct, Your Honor. But we also need to look at this in the context of other cases to determine whether or not this becomes a disparity in sentencing. And when we start looking at some of these other cases where there have been positions of trust, we still find that this is a much more serious sentence when it was done by a hidden camera that he was not using to actually have contact with the children in the bathroom where he was not directing them to do anything. So when we look at cases like ONI, and he did not distribute the images, where the defendant had actually sexually abused the children, he distributed the images. In fact, those images were found in possession of over 3,000 offenders after the fact. We don't have that kind of facts in this case. And in ONI, a lesser sentence was given. May I just be sure I understand? Your client pleaded guilty in the end, not to the original agreement that was offered, but pleaded guilty to the entire indictment, right? Correct, Your Honor. And on the entire indictment, there were 61 counts of production of child pornography. Correct, Your Honor. And am I also correct that each carried a mandatory minimum of 15 years? Correct, Your Honor. So the argument here is that you're complaining that the district judge should have run the counts concurrently, rather than some of them consecutively, or shouldn't have reached the maximum? I mean, the sentence equates to the maximum, 30 years- Correct, Your Honor. On one count, concurrent to every other count. Indeed, that's how the sentence is specified. But your client would have received at least 15 years, right? Yes, Your Honor. So what are you saying, that the district judge should only have sentenced him to 15 years, or something less than 30 years on one count, and run them all concurrently? Somewhere within- Because I think what the concern I have is, in doing substantive reasonableness, which is a very deferential standard of review, are we saying that it was outside the broad range available to the district judge to sentence him to the maximum, but only have it effectively be for one count? Yes, Your Honor. Because we need to start considering this if we're looking at disparities in other types of cases. We need to carefully evaluate what these actions are. And I'm not sure you- Well, let me ask you to reserve the disparity argument for a moment. You're saying that sentencing to the maximum on one count, and then rating that concurrent to every other possession count, was outside the realm of options available to the district judge? We think that that was unreasonable in this case, Your Honor.  Well, I think once we start looking at the other types of cases that are, that have occurred with production, we find that this is significantly more severe. Even if you just look at the fact that there were a lot of children, which we do not deny, in production cases, the average sentence that's been imposed, according to the Sentencing Commission, has been 275 months imprisonment. Now, the district judge explained that by saying he had never seen a case with this many counts, which effectively means this many victims. Well, with 61 victims plus the possession counts, correct, Your Honor? Well, possession is not necessarily all of the children at the school. Correct. The possession count is other children, and I don't mean to minimize that. But I don't think you've shown us another case that had this number of victims, right, in terms of talking about disparity. No, Your Honor. But what we look at in terms of the actions that were involved with the victims, I think we need to take that into consideration. And that's why I was trying to direct the Court's attention to Judge Underhill's dissent in Muzio, where he identifies a number of factors that a judge should take into account when looking at these cases. But that isn't an issue you're preserving, because it's a dissent, right? Yes, Your Honor. It's a dissenting opinion. Yes, it is, Your Honor. But I believe that this does provide, the Court can provide guidance to the District Court in how to start looking at these cases and to evaluate them. Unless the Court has further questions for me at this time, I believe I did reserve a few minutes for rebuttal. Thank you. Thank you, Mr. Gregory. Good morning. May it please the Court, Catherine Gregory for the United States. This Court should affirm the judgment. I believe Mr. Clos' counsel has just conceded the spore issue forecloses his arguments with respect to I need you to pull the microphone a little closer. Thank you. Or at least higher. Is that better, Your Honor? Thank you. I apologize. I'm a soft talker. I'll try to project more. He's already conceded that spore forecloses his argument as to the factual basis of the plea, and the District Court acted within its discretion here when it imposed a sentence that, yes, is serious, but reflected the enormity of the conduct in this case. I think it goes without saying that 61 victims, including the nine who were physically molested, from ages four and up, over seven years, with Mr. Clos' position of trust, a music teacher, not just of children generally, but specifically special needs children, manipulated the relationship that he could gain access to over such a long period of time. How do you deal with the defense argument that, in terms of looking at the severity of the conduct, the physical conduct was grooming, not sexual abuse? That's how the defense has characterized your position. I want to be sure I understand what your position is. They said it was sexual contact. I think that if we even look at the definition of sexual contact, it's over or under clothing in the groin. I understand that, but they're saying that you represented it as grooming to the District Court. That was one of the ways we described it, but I think we also made the argument that in one of the videos, which we even showed the judge at sentencing, he appears to kiss one of the children, which, granted, you can't quite see it from the angles of the camera, but we were making that argument that there was physical sexual contact. Was he charged with that federally or state? No, he was not. But I can't speak to the strategy that underlies the charging decisions in this particular case. I can say that the judge did see a selection of those videos, including some of the contact with the students, and Judge Sirigusa actually took a very conservative approach in that respect. He said, I'm not going off of what might have happened or what might have happened had he continued to groom them. I'm going off of what I can actually see with this sentence. As your honors have noted, Judge Sirigusa has been on the bench for 25 years. He has never seen, he said, a case where a defendant pled guilty to 74 child pornography-related counts, and I'll submit that the cases that Mr. Close raises as possible comparators, you simply can't compare it. This case is almost unique. I've never seen a case, I couldn't find a case where there were this many victims, at least coming out of our district, and over this amount of time with the added physical element. And at the same time, Judge Sirigusa was very careful and deliberate in his reasoning for this sentence. The government asked for, I believe, 61 years, what we've categorized roughly as a year per child, and he went below that. He went to the 600 months, the 50 years, which, again, is a serious sentence, but I think we can get lost in the numbers a little bit. 61 children, this courtroom holds 64 people maximum. That means that you could fill every seat behind us with one of Mr. Close's victims and there would still be a child waiting in the hallway. And I think that that can't be overstated in this case, even if, as Mr. Close seems to argue, it's, in his view, not as bad that there wasn't physical contact. This court has held in several cases that there's no categorical rule that non-contact production of child pornography is in any way less traumatic for the child or less harmful in the long run. Well, and then ultimately, we weren't the ones sentencing. We have to review what the district court did. There's a standard of review. That's correct. And again, it's abuse of discretion. And this court has said it approaches these kinds of substantive reasonableness claims with restraint, not micromanagement. So the question isn't might this court have come to a different conclusion. It's whether the district court abused its substantial discretion in imposing this sentence. Counsel referred particularly to the parsimony clause. What do you say with response to the response? I'm sorry, Your Honor, to which clause? The parsimony clause, a sentence that doesn't exceed the maximum that's necessary to fulfill the purposes of sentencing. I would submit that Judge Sirigusa at sentencing explained that he was looking for something that wouldn't. He said several times, I'm looking for a sentence that's sufficient but not greater than necessary and that he was aware of the need to avoid unwarranted sentencing disparities. I think that's key to unwarranted sentencing disparities, right, because disparity just means a difference. And ultimately, how a district court weighs a violent physical contact with one child versus less physical but still traumatizing contact with 61 children, I think that Judge Sirigusa was mindful, explained why he was trying to come to what he saw as an appropriate number that would ensure justice for every child. But again, I believe even in his briefing, Mr. Close concedes that there are sentences that are above this and there are sentences that are below this in the child pornography category and that this does fall within that general range. And in this case, again, approaching this with an eye towards restraint, not micromanagement, and the fact that this is an abusive discretion standard, the district court did act within its discretion, weighing those facts and circumstances carefully when it came to a sentence and imposed a sentence that is reflective of the enormity of the conduct in this case. And unless the panel has further questions, we ask you affirm the judgment. Counsel, you have two minutes. Thank you, Your Honor. I think it's important to distinguish how the government characterized this because it also characterized the behavior in the classroom as grooming because it also distinguishes between what they viewed as sexual behavior and how they could have charged him for that conduct. But, you know, there's grooming where you buy the child pretty things or toys or whatever, and then there's grooming like this that makes the child think that this kind of physical conduct is acceptable so that then the next step can be done. But this was physical conduct. So, you know, I'm not sure how much the grooming label helps us here. The judge saw what it was. Yes, Judge. Yes, Your Honor. What's also worth noting, however, is that some of these students that he was grooming, it was over a long period of time and nothing went beyond that behavior. So even though he was grooming them, we'll accept that term for the moment, he never went any further than that. So he never went further, never tried to engage in any other types of conduct with them. So I think those are important distinctions. The 74 counts, while the court did focus on that, the 74 counts were based on the fact that Mr. Close turned down a two-count indictment that would have required him to waive his right to appeal a 60-month sentence. And the judge indicated at the plea hearing that he understood why this occurred because that is, again, a sentence that we believe is greater than necessary to serve the purposes of sentencing. We believe that in Mr. Close's case, a lesser sentence would be sufficient to accomplish the goals of imposing inadequate punishment and to deter future conduct in avoiding unwarranted sentencing disparities. Thus, I respectfully request that you vacate the judgment and remand the case to the district court for resentencing. And to the extent you think we should provide guidance to the district court, at what point does the district court have, would it be a reasonable sentence, a substantively reasonable sentence as a matter of law? I don't know if at this point we can say what is a reasonable sentence. I think we would have to look to see what happens at sentencing. It could be that a- What more or less should be happening at sentencing? Because, you know, if we send this back down to the district judge and it imposes a 40-year sentence or a 45-year sentence, you know, are we going to be back up here again? I think, well, I can't say that honestly at the moment, but I think if we provide, if you provide some guidance for the court to look at, such as what Judge Underhill suggested in Muzio, I think we can start to distinguish this case- If I don't ignore the fact, as you said, that this could very well be a life sentence for the defendant. It's 50 years. I understand the severity of that sentence. But another way to look at it is, at least on the production count, it's two years per child, which doesn't sound nearly as severe. Your Honor, I agree that this is a life sentence. I think when you start to look at other production cases where the harm that was performed on the child was actually much more severe, where the children had been raped, where their images had been sent around the country- Right, but they're not 60 of them. No. That's why I said to you we can look at it from the gross perspective that it's a 50-year sentence and be very affected by that, or we can look at it as two years per child, which may seem like a modest sentence. So tell me at what point the law would step in and find this to be a substantively reasonable sentence? I think at the point that we can determine how we can distinguish this case from the other cases where this has occurred. All right. Thank you. Thank you, Your Honor. We will take it under advisement. And then our last case on argument is Bronstein v. Sahara Plaza. Thank you. Thank you. And Mr. Lugnato? Am I pronouncing your name right? Lugnato, Your Honor. Lugnato? Yes. Thank you. You've reserved two minutes, is that correct? That's correct. We are ready when you are. Thank you. May it please the Court. In this gender discrimination case, it is respectfully submitted that the District Court erred in granting summary judgment in favor of the defendants dismissing the plaintiff's claims of gender discrimination, harassment, and retaliation. The Court properly found that the plaintiff had established a prima facie case of unlawful gender discrimination and retaliation. The Court found that the defendant had succeeded in shifting the burden to the plaintiff, by alleging that it had a proper ground for dismissing, terminating the plaintiff's employment. The asserted ground was the subjective standard of that she was difficult to work with. And then the Court, despite the finding of prima facie gender discrimination and retaliation, concluded that the plaintiff had failed to raise an issue of fact and had not presented any proof sufficient to defeat summary judgment on the issue of pretext. It's respectfully submitted that the plaintiff did succeed in meeting her burden, that the Court's finding of prima facie discrimination and disparate treatment evidencing discriminatory intent, that is evidence that can be used on the issue of pretext and sufficiently established that the plaintiff's termination or the reasons for her determination should at least be permitted to be determined by a jury. Can you talk to me about a couple of things like the same actor inference? Like it was Mariano that hired and fired the plaintiff within the span of a short period of time. Presumably, the inference is that he wasn't going to be discriminatory toward her because he hired her, but then he was the same actor that fired her. Should we consider this inference at all? I don't believe that we should. Under the circumstances, we're two things. Mariano, number one- Well, it's case law that says we should consider it. Considering it, yes, but I don't think it should be applied. Or if the inference is applied, the plaintiff should be permitted to rebut it and should be able to have that issue determined by a jury. Despite that inference, Mariano himself demonstrated discriminatory bias. Perhaps more importantly, he based- The evidence of the bias is the inappropriate language he had in the conversation that she recorded. That's part of it, in addition to the fact that he had treated her differently. There was disparate treatment as well between her and her all-male coworkers in terms of how complaints were treated, complaints against her. She was not given an opportunity to respond. The complaints were given credence. Whereas when she was complained, no action was taken. Perhaps more importantly, it appears that he based- Mariano based his determination to terminate the plaintiff based on a performance review, which was, number one, inaccurate according to the plaintiff's testimony, but, two, was created by someone who the court found to have exhibited discriminatory animus and disparate treatment. And another- I didn't see you allege cat's paws. I mean, is that your theory of liability? Say it again. The cat's paw theory? The idea that Mariano was manipulated by either Winterson or Durow? Not necessarily manipulated, but certainly influenced in reaching his conclusion. But you didn't allege that, right? I don't. Honestly, Your Honor, I'm not sure if it's alleged in the complaint, but it's certainly argued in the papers. And how does the evidence support that? Mariano- What evidence is there to support that? Mariano explained that his determination to fire the plaintiff was based on the performance evaluation, and the lower court found that as well. Mariano expressed, testified that the determination to terminate the plaintiff's employment was premised on the input from his supervisors, and those supervisors-I'm sorry, her supervisors-those supervisors were Durow. It's not that he has to have just looked at that. In our decision in Nagel, it says you have to show the evidence that Mariano merely served as a conduit vehicle, a rubber stamp, by which people like Winterson or Durow would have achieved their design. And I'm not sure you produced any evidence that that was the case, that it was based entirely on her allegedly poor performance review by Winterson. I believe that it was, Your Honor, because if you look at Mariano's own explanation for- It is that he received numerous complaints about her, including from a female manager, four female cocktail servers, two female consultants. And he concluded that after several attempted interventions, the plaintiff was not addressing her own behavior and demonstrating a willingness to change it. He may have testified to that, but he also testified that he believed she was a good worker. He believed that she responded to criticism well, that she was- But this was his ultimate conclusion based on the numerous complaints he was receiving. Well, again, in terms of the complaints, he didn't hear the plaintiff out. He didn't give her an opportunity to address them. Our task here is not to decide whether or not they should have fired her, but whether they did so for an impermissible reason. And that's my concern, is how do you demonstrate that Mariano did so, either for an impermissible reason or because he was basically manipulated by others? I think that, Your Honor, there's sufficient evidence to permit a jury to reach that conclusion. Number one, based on the fact that Mariano exhibited disparate treatment and discriminatory animus, that he testified that he based at least in part on the performance of- I don't think your arguments about disparate treatment are merited at all, because the persons you compare her to are not comparable. And the comparisons simply, they're not the same. But tell me more about the discriminatory animus. It seems to me that the evidence of discriminatory animus on the part of Mariano, at least, is extremely thin. So tell me what you think is the best case for the discriminatory animus on the part of Mariano. Well, Your Honor, I think it starts with something as simple as when she went to complain about the performance evaluation, he used that, I won't say the term here, but he used that derogatory term that had been used pervasively throughout her employment by Mariano, as well as the other supervisors and coworkers that she- Don't say you're not going to use the discriminatory term. We're here to talk about the evidence. So tell me what the evidence is. Okay. When she complained about her performance evaluation, his response was, what do you expect? You're a bitch. I believe that that, and again, the plaintiff testified that that word was used pervasively, not just by her supervisors and coworkers, but by Mariano himself. Being used in the context of telling her that she was extremely difficult to work with, and not cooperative in various ways. So I'm not sure how we would automatically assume that meant gender hostility. Indeed, in the Pacino versus Verizon Wireless case, we rejected a rule that would automatically use that, automatically infer from that word gender hostility. Your Honor, I'm not saying that that's the sole basis of the gender hostility. Judge LaValle asked you for what your best evidence was. So beyond the use of that word, what else is there to show Mariano's gender hostility? I believe the lower court even acknowledged that the plaintiff's opinions were rejected, whereas the opinions of the- How does that show gender hostility? I think that in combination with lending credence to the complaints made against her and not accepting her complaints against the other people. Listen, I think the evidence is clear that assuming the plaintiff was difficult to work with, her coworkers were also difficult to work with as well. She was physically attacked. She was verbally abused. And she was generally not treated in the same way by people who were- in her firing. The court was clear that he exhibited discriminatory animus and used the bitch word repeatedly, made anti-Semitic remarks to the plaintiff, and was constantly arguing with her. It sounds to me like the court and the defendants- What were the anti-Semitic remarks? I don't believe that specific wording is set forth in the record. I know that it was at least on two occasions that anti-Semitic- That's not the claim, right? Correct, that's not the claim. Okay. But I think it's evidence of the- Using an anti-Semitic remark is evidence of gender discrimination? I think when you look at it in the totality of circumstances, it is. Can we talk a little bit about the retaliation claim? When I first read your papers, I thought you were going to say that the retaliation came after she first complained about the Taylor visit. But that's not what I understand your argument. Your argument is where? Like, was it the- I'm having a hard time pinning down what you think was the action that precipitated the retaliation. Like, what was the complaint that precipitated the retaliation? I think there were several complaints, Your Honor. I think it started with the Taylor incident. It then continued with the- Okay, but then what was the retaliatory action in response to the Taylor complaint? I saw a lot of complaints, and I saw a lot of allegations of adverse action. I did not see which one temporarily gave rise. Your Honor, I think as the district court found, I think it was retaliation every time the plaintiff complained. She faced a retaliatory reaction. First, it was the Taylor incident. Then it was the McSloy incident. What would you say is the retaliation that she experienced from the Taylor? She was considered to be a complainer. She was said that her complaints were not ladylike, that she was acting like a baby by making complaints. Yeah, but that's not an action, right? That's not an employment situation. Well, that culminated in the performance evaluation. I think that that's something else to consider here. I think the lower court looked only at the termination as being the only adverse employment action. But there was the taking away the lucrative Saturday night shift and giving it to Mennite. There was the negative performance evaluation, and then ultimately there was the firing. I think that each of those has to be looked at. I agree that those are interesting. Where I'm missing is where it was pled. What did you give us enough to say that any one of those was in connection to some of the treatment? Which one do you think is your strongest evidence suggesting an X and then a Y? Perhaps I would probably say her complaints about Daruli. Daruli had made misogynistic remarks to her. She complained about them. She was then labeled as a complainer and difficult to work with and such and such. And basically, Your Honor, it appears to me that the use of the word bitch attributing that to the plaintiff is basically the reason that she was fired. That's just a, you know, saying difficult to work with, with a woman who's the only woman working there, I think is just shorthand for their belief that she was a bitch because she complained. How is that in a circumstance where the complaints are coming from women? I'm sorry, Your Honor? How is that so when the complaints are coming from women? I mean, you're suggesting that viewing her as difficult to work with was code for gender discrimination. And I'm asking how that is, how that conclusion can be reached when the complaints came from many women. Your Honor, the- A female manager for a female cocktail service, two female consultants. Your Honor, the- As I said to you, we have rejected the notion that the use of the word in and of itself is a basis for finding gender discrimination. And here where the complaints come from women, I'm not sure you can ask us to infer that this is gender discrimination. Your Honor, the primary complaints about the plaintiff's behavior came from the men that she worked with. Your Honor is picking on a specific incident in which the plaintiff observed some of the cocktail waitresses interacting inappropriately with some of the customers. She went and, at the suggestion of her supervisor, went to Mariano to make that complaint. And that is where this issue was raised. Mariano happened to agree with her that she acted appropriately in bringing that to his attention. But the bulk of the complaints about her and her supposed difficulty in working together with others- You're talking about her complaint about other women. I am referring to their complaints about her, her failure to produce the drinks that were ordered in a timely manner, her failure to help out with things. There are a whole bunch of these in the record. Well, again, Your Honor, I believe that that's relatively minor compared to the other issues. And I think that, again, this is an issue, I believe, Your Honor, this is an issue that should be determined by a jury, not by the court. Thank you. Thank you, Your Honor. Thank you. We'll see you in a little while. Good morning, Your Honors. May it please the Court. The fundamental issue before this Court is whether there are genuine issues of material fact, not issues of fact. Genuine issues of material fact warranting a trial on Ms. Braunstein's hostile work environment, gender discrimination, or retaliation claims. The answer is no, not just because of the lengthy reasons given by Judge Broderick in his opinion, but because of all of the following undisputed facts. The appellant worked at the plaza for only 138 days. Her position was covered by a collective bargaining agreement. As a union-represented employee, she was subject to a probationary period of 150 days. Her job description, her written job description expressly stated that as a bartender, she had to have excellent communication skills, strong interpersonal abilities, and the ability to work cohesively with her fellow employees as a part of a team. After two months of employment, she received a written performance review from her direct manager, Mr. Winderson, stating that she had not demonstrated any of the following behaviors. Respect for others, professionalism, responsibility, good attendance and punctuality, the ability to be a team player, leadership. What would you say, Counselor, to the argument that your colleague on the other side says about as soon as she complained about the tailor that set a tone that she was not going to tolerate an environment that may have thought it was okay to use the B word in a professional setting and the like. How would you respond to that and that everything fell from her saying, however you all did this in the past, I am not going to make do in an environment that is sexually charged and sexually harassing. You guys are going to have to do better. Your Honor, what I would say is there isn't a scintilla of evidence linking the tailor incident to the written performance appraisal. Nothing. There was an incident. It was looked into. It was addressed. And she continued her employment. If you search the record, she never raises that again. She never raises that in the context of her performance appraisal. She never raises it during the course of her complaints about any of the other employees or male or female. It doesn't come up. There's no nexus. And the judge didn't see a nexus. And that's the reason why that argument fails. It's an incident that occurred at the outset of her employment. If there was truly an intent to terminate her, based upon that incident, my suggestion, Your Honor. That's the easy form of the argument. I think the harder form of the argument is it's not that there was an intent to terminate her. It's that people decided she was difficult because she was saying this kind of charged environment is not acceptable anymore, not with me being here. And so they were looking for reasons to react poorly to her surfacing issues of discrimination. I understood, Your Honor. I think what I would say is this so-called linkage, and I'm not suggesting that you're making that linkage, but if there's any linkage there, this is purely surmise and conjecture. There's no testimony. There's no evidence that actually links the two. It's a supposition. And there is no evidence, and I think that the judge pointed this out when he reviewed the job description. The issue isn't whether she agreed with the characterizations of her behavior or her performance. The issue is whether the persons who spoke with her issued that appraisal. Did they really believe this, or was this a subterfuge and a pretext for gender hostility? And there isn't any evidence that would show that it was. But so what's the line, though, between gender hostility and I think you're a pain and difficult because you are not allowing me to engage in hostile conversation or interactions at work? Where is that line coming in? It's very difficult to draw that line, Your Honor. I think what you have to do is if, as a part of her position, she needs to demonstrate an ability to work collaboratively and cohesively with coworkers, and there is massive amounts of evidence that she could not, I would submit to you, Your Honor, that that doesn't then turn it into a focus on her because of female characteristics. It's talking about conduct. This is going to be a poor analogy, but one of the things that I'm thinking about is, like, in public accommodations law, nobody could say, oh, well, we had to hire or we had to let these kinds of customers in because they're going to offend our other racist customers. Right? So, like, in this setting, one can imagine an environment that was used to interacting and discussing things in a certain way, being frustrated that someone was suggesting that there should be a new way of being professional with each other. And the way I hear your argument is that the best explanation you have is just that it simply wasn't play. Right? You know, connecting her complaints to the way people were responding to those complaints that intersect with gender. That isn't necessarily my argument. Okay. That if your manager, in the context of a performance appraisal, says to you that your manner of interaction is problematic because I'm receiving complaints by males and females alike, and your response to that is, well, I own that. That's just the way I am because I'm a New Yorker. It's worked for me for 20 years, and that's the way I'm going to present myself. It's basically a statement, I am not going to address my behavior. I'm going to simply say you'll have to deal with it. I thought her behavior was, the issues about her behavior were not arising in the context of the complaints she made about the tailor or things like that. It was about her failure to be a team player with respect to the, you know, providing the waitresses with support and other things like that, which would be totally divorced from trying to change the dynamics of the environment because they had a sexist overtone. Am I right that that's what the complaints that prompted her termination relate to? Okay, I'm not- Is that not right? I'm not entirely sure I understand the context of your question. What got her fired? What was the difficult behavior that got her fired? I would simply submit that when it was brought to her attention that her manner of presenting herself- In what context, her manner of presenting herself? While on the job, while interacting with other bartenders, while interacting with female servants- Not her actions in complaining about the tailor's sexist remark or the aggressive attitude of one of her colleagues. Is that right or not? That's correct because I don't know that there is even one ounce of evidence in this record that indicates that it was because she was complaining about issues of concern to her that that was crossing the line. It was the way that she conducted herself in the restaurant, behind the bar, with her coworkers. That was the gist of her termination. And remember, we're talking about 138 days of employment here. So if an employee who has just started has indicated that that is just who I am, this is how I interact, it has always worked for me and that's the way it's going to do. I don't see how this indicates a willingness- I'm not even going to use the word conform- but to interact harmoniously with the people that you have to work with on a day-to-day basis, including customers. I think, Your Honor, your point about the female complaints, it was not just that three female servers complained about her, but she did so- she complained to a manager and raised these complaints, which the servers characterized as derogatory, and did so so loudly on the job that they overheard the complaints and they were very upset by that. It was just inappropriate, unprofessional, and not really thoughtful if you're trying to work with the servers. Can I ask you about another matter? How does one reconcile a finding by the district court that the plaintiff has made out a prima facie case with the further finding that the plaintiff loses on summary judgment? How do we reconcile those? Because I think the standard for establishing a prima facie case is so light, is so easy, that you need something more, Your Honor. That's only true until the employer furnishes a reason for the action. Correct. The Supreme Court has made clear the presumptions that favor the plaintiff until the defendant furnishes a reason. Those presumptions drop away. Correct. And after that, a prima facie case means the same thing as it does in all the other classes of cases. It doesn't have the Walter meaning that it does under McDonnell Douglas in the previous case. So how, then, does one reconcile the proposition that the plaintiff has made out a prima facie case with the proposition that the plaintiff loses on summary judgment? Because I think, Your Honor, again, with all due respect, if she's using the exact same evidence twice, and one is an easy standard to meet, and you have to prove to the judge that there is a triable issue of fact on pretext, and nothing that she has presented shows anything that a jury could conclude that this was pretextual. There's nothing suspicious about the timing of her termination, because it was at the end of a probationary period. Well, in this case, the judge has found that your client carried its burden at step two, right? Yes, because it's only a matter of articulation. We're no longer concerned with the prima facie case. We're concerned with whether she satisfies step three. You're correct, Your Honor. OK. You're right. Sorry, Mr. Judge, but just using the term satisfy the prima facie case with reference to the original meaning, and not with reference to the prima facie case as it had been converted once the defendant met its burden of explaining. Your Honor, the other thing I would say is if the way to analyze these cases is whether the plaintiff satisfied a prima facie burden, because de facto, if you use the exact same evidence, it by definition establishes pretext, then virtually every case would go to trial. Not necessarily. Sometimes the prima facie case may be very strong, and may itself offer evidence of discrimination that makes the proffered reason suspect. Then it does have to go to trial. Fair enough, Your Honor. OK. I don't think that the evidence is nearly that strong, because I think on the prima facie case, she has to establish that her termination arose under circumstances giving rise to an inference of gender discrimination. There isn't any such evidence, not when it wasn't a single person. And I think that the single actor doctrine is very important here. What do you say about the use of the word bitch and the use of the word not ladylike? Well, let's talk about the word bitch. I think, Your Honor, and as Judge Broderick did, I think you need to look and examine at the context in which he used it. Fortunately for us, the plaintiff clandestinely tape recorded the conversation. And what was said during the conversation is not in dispute. He was trying to coach her. He was trying to change behaviors. And he didn't say, you are a bitch. What he said was, and he spelled it out, there might be days when you are a B-I-T-C-H. Now, do I condone the use of that language? No, I don't. But the Supreme Court has specifically stated that Title VII is not a civility in the Workplace Act. It's about actual discrimination. So I would say, Your Honor, the use of that word in and of itself, consistent with this court's decision in Pacino v. Verizon Communications, is that's just not enough. You've got to look at the context. You have to look at the context. That's not enough to get to trial. There isn't any such thing. And as far as the ladylike comments, I don't believe that that's something that was made by the decision maker here. I think it may have been a comment that was a random comment, a stray comment made by somebody who used it for judgment. But it doesn't evidence that her job loss or even her performance appraisal were tainted by anti-female bias. It just doesn't establish it would be my answer, Your Honor. I see that my time is up. If there are no other questions from the bench, I will sit down. Thank you. And you have two minutes, Officer Mignogna. Thank you, Your Honor. Just a couple of points here. Addressing the last matter, the court's finding that the plaintiff had made out a prima facie case. I believe the prima facie evidence is strong. I leave it up to the court to assess that. But I do want to point out that the plaintiff's evidence on pretext is not just the same evidence that the court talked about in finding a prima facie case. But the evidence of Mariano's bias, his saying, not just using the word, some days you're going to be a bitch. He also said, when the plaintiff complained about her performance review, he also said, what do you expect? You're a bitch. The issue of, I think you also have to look at the issue when you're judging not just the prima facie evidence or the finding that the evidence was sufficient to establish a prima facie case. But also to look at the reason given by the defendants for the firing that she was difficult to work with. We're not, as I believe came out in the last part of the argument, there's no specific incident here where it was, she's fired because of this. All right, she was fired because she did this, or she was fired because she had a run in with the other waitresses. It was nothing like that. It just was, that's it, you're terminated. And when asked to give the reason, the reason was she's difficult to work with. Which goes back to Your Honor's discussion of the complaining. My adversary tries to make it out as though there were, that the issue of her complaining wasn't what made, what they assessed was what made her difficult to work with. And again, I think that that goes back to the use of the word bitch. And the fact that this was the opinion that they had of her because she complained, because she wasn't going to let them run all over her. When she had to deal with the Taylor incident, when she had to deal with the McSloy incident, when she had to deal with arguments with Deruli, Rosa, physically and verbally abusing her. The environment here, I think, was clearly discriminatory, and when you deal with the discriminatory conduct and compare it to the subjective criteria that was asserted as the grounds for the firing. I think it becomes clear that the evidence on pretext was sufficient to go to a jury. Thank you very much, Your Honor. Thank you both. We will take the case under advisement. That concludes argument on the cases on the appeal calendar for today. We do have one case on submission, that being in regarding Edwards versus Waters. It's 21-12-19. I want to thank the clerk's office and the court security office and marshals for keeping the courtroom safe and the docket in order. Ms. Jasmine, you are ready to call us out. Court is adjourned. Thank you.